**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

**ERIC WILSON, #2249777**                                        **CIVIL ACTION**

**VERSUS**                                                                      **NO. 12-386**

**MARLIN GUSMAN, SHERIFF**                                **SECTION F (3)**
**ORLEANS PARISH**

RESPONSE TO PETITION FOR *HABEAS CORPUS* RELIEF

      The petitioner, Eric Wilson, is a Louisiana pretrial detainee currently awaiting trial on charges of forcible rape, armed robbery, false personation of a peace officer, and second-degree kidnapping. His first trial ended on June 9, 2011, when the state trial court, *sua sponte*, declared a mistrial in light of the sudden unavailability of the State's main witness due to her emergency hospitalization. Wilson's resulting motion to quash the prosecution on double jeopardy grounds was ultimately denied by the Louisiana Supreme Court. *State v. Wilson*, 76 So.3d 1187 (La. 2011). Wilson seeks a writ of *habeas corpus* from this Court, contending that his current incarceration is in violation of his rights under the United States Constitution.[1] While his petition is timely filed, and the claims raised therein properly exhausted in the state courts, Wilson fails to demonstrate his entitlement to *habeas* relief. The instant petition should therefore be denied with prejudice.

---

[1] Rec. Doc. 4.

RECORD

The respondent submits that the exhibits lodged with this Court as attachments to Wilson's *habeas* petition are sufficient to permit full review and disposal of this matter without the need for supplementation by the undersigned counsel.

PROCEDURAL HISTORY

Wilson is presently charged by the State of Louisiana with one count of forcible rape, one count of second degree kidnapping, one count of armed robbery, and one count of false personation of a peace officer, in relation to acts committed against J.T. on April 8, 2010, in Orleans Parish, Louisiana. See La. Stat. Ann. §§ 14:42.1, 14:44.1, 14:64, 14:112.1.[2]

The case was set for trial in the Orleans Parish Criminal District Court on June 2, 2011, and, following voir dire, a jury was sworn that day.[3]  Because this was the first day of service for this particular jury pool, and as the selection process took approximately six to seven hours to complete, the trial court determined, "in the interest of justice and for the well being of everyone involved, that the case would be reconvened at the next jury day of [those particular] jurors."[4] That next jury day was June 7, 2011.

Meanwhile, on May 30, 2011, the State attempted to serve J.T., who resides in Clovis, New Mexico, with a subpoena to appear in court on June 2, 2011, and again on June 3, 2011, to appear in court on June 7, 2011.[5]  However, the record does not indicate that service was actually effected.[6]  The victim missed all three of the flights that the State had booked for her.[7]  She was

_____

[2] Rec. Doc. 4, Ex. 1-A, Bill of Information.
[3] *Id.*, Ex. 1-F, 6/9/11 Transcript, p. 33-34.
[4] *Id.*, at 34.
[5] *Id.*, Ex. 1-E, 6/7/11 Transcript, p. 3.
[6] *Ibid.*
[7] *Id.*, Ex. 1-G, Motion and Order for Appearance of Material Witness ("Material Witness Bond"); Ex. 1-E, 6/7/11 Transcript, p. 6.

afraid to board the first two flights because she was three to four months pregnant and felt ill.[8]
She missed her third flight because her car broke down en route to the airport and, after the State
had called a taxi to take her to the airport, she did not have the money required to check her
luggage.[9]  Several representatives of the State, however, continued to maintain in contact with
the victim, her fiancé, and several members of her family, in order to secure her presence in
court.[10]  At all times, prosecutors anticipated her appearance at trial.

Because the looming trial date, on June 5, 2011, the State, out of an abundance of
caution, contacted the trial court in order to obtain a material witness bond for the victim.[11]  On
June 7, 2011, the State requested and was granted a recess until June 9, 2011, owing to the
continued absence of its witness.[12]  Wilson objected to the recess, arguing that he would be
prejudiced because (1) the jurors' attitudes may change over the passage of time; (2) he was
incarcerated; and (3) the public defender's caseload was too heavy to give his matter the same
attention in the coming days.[13]  In the intervening time, the district attorney's office sent two
investigators, Lisa Thornton and Brian Lapeyrolerie[14], to New Mexico in order to ensure that J.T.
boarded her flight to New Orleans.[15]

Thornton and Lapeyrolierie went to J.T.'s home and eventually made contact with her
after she returned from a doctor's appointment.[16]  The victim was ready to travel and informed
the investigators that she was, indeed, trying to make it to New Orleans for trial.[17]   The

---

[8] *Id*., Ex. 1-E, 6/7/11 Transcript, p. 6-7.
[9] *Id*., at 7.
[10] *Id*., at 7-8.
[11] *Id*., Ex. 1-F, 6/9/11 Transcript, p. 3-4.
[12] *Id*., Ex. 1-E, 6/7/11 Transcript, p. 8.
[13] *Id*., at 9-10.
[14] Mr. Lapeyrolerie's name—admittedly a tongue twister—is misspelled as "Laperoli" in the hearing transcript, consistent with its usual pronunciation.
[15] *Ibid.*
[16] *Id*., at 10-11.
[17] *Id*., at 20.

investigators, however, noted that the victim was visibly in pain.[18]   The victim informed the investigators that she was having cramping and bleeding, and thought she may have been having a miscarriage.[19]   After J.T. had finished packing and she, Thornton and Lapeyrolerie were on their way to the airport, her physician called and informed them that J.T. must return to the clinic immediately.[20]   Once they had arrived, J.T's physician, Dr. Lonnie Alexander, informed the investigators that the victim was having an ectopic pregnancy and required immediate surgery.[21]

A hearing was conducted on June 9, 2011, wherein all of the above was imparted to the trial court.[22]   The State asked that the matter, again, be recessed, owing to the unforeseen difficulties in securing J.T.'s presence.[23]   In ruling on the State's request, the court noted that the victim was in emergency surgery that very day and that her she would be "risking her life" if she were not hospitalized.[24]   The court took judicial notice from personal experience that ectopic pregnancies present a "great, grave danger" to the women who suffer them.[25]   Finally, the court noted that it was unknown how long J.T. would be unavailable due to her recovery from emergency surgery.[26]

The court then confronted the paradox that a recess was clearly required, but that the granting of such a recess would be unfair to all parties involved.[27]   In light of this conundrum, the trial court determined that it was "physically impossible" to proceed and declared a mistrial

---

[18] *Id*., at 11.
[19] *Ibid*.
[20] *Id*., at 11–12.
[21] *Id*., at 13.  Ectopic pregnancy is an abnormal pregnancy that occurs outside the uterus, and constitutes a medical emergency requiring surgery to remove the fetus.  If left untreated, ectopic pregnancy can lead to shock and even death of the mother. (Source: National Institutes of Health, U.S. National Library of Medicine, available at: http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001897/ (last accessed 2/28/2012)).
[22] See, generally, Rec. Doc. 4, Ex. 1-F, 6/9/11 Transcript.
[23] *Id*,. at 15.
[24] *Id*., at 35.
[25] *Ibid*.
[26] *Ibid*.
[27] *Ibid*.

under La. Code Crim. Pro. art. 775(5).[28]  Wilson objected, claiming that he had "been ready" for trial since June 2, 2011—despite the fact that he had filed four separate motions since that date—and that the mistrial only benefitted the State—despite the fact that he had previously argued against the granting of a recess (the only viable alternative), because a recess would prejudice him.[29]

On July 26, 2011, Wilson moved to quash the bill of information on double jeopardy grounds, which was denied by the trial court.[30]  The Louisiana Fourth Circuit Court of Appeal granted Wilson's resulting writ application on November 15, 2011, sustaining the motion to quash, dismissing the prosecution, and ordering his release. *State v. Wilson*, 2011-K-1056 (La.App. 4 Cir. Nov. 15, 2011) (Unpub.).[31]  On December 16, 2011, the Louisiana Supreme Court reversed the court of appeal and reinstated the trial court's denial of Wilson's motion to quash, basing its order on "the unusual facts of this case, especially that the State's prime witness had to undergo emergency surgery and would risk her life in attempting to come to Louisiana to testify." *State v. Wilson*, 76 So.3d 1187 (La. 2011).[32]

Wilson filed the instant federal *habeas corpus* petition in this Court on February 14, 2012.[33]

---

[28] *Id.*, at 35-36.  La. Code Crim. Pro. art. 775 states:

"A mistrial may be ordered, and in a jury case the jury dismissed, when:
 (1) The defendant consents thereto;
 (2) The jury is unable to agree upon a verdict;
 (3) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law;
 (4) The court finds that the defendant does not have the mental capacity to proceed;
 (5) It is physically impossible to proceed with the trial in conformity with law; or
 (6) False statements of a juror on voir dire prevent a fair trial."

[29] *Id.*, at 37.
[30] *Id.*, Ex. 1-D, Motion to Quash; Ex. 1-B. Minute Entry, 7/26/11.
[31] *Id.*, Ex. 2, 4th Cir. Order, *State v. Wilson*, 2011-K-1056, 11/15/11.
[32] *Id.*, Ex. 7, S. Ct. Order, *State v. Wilson*, 2011-KK-2532, 12/16/11.
[33] Rec. Doc. 4, *supra*.

<u>*HABEAS* PETITIONS UNDER 28 U.S.C. § 2241 GENERALLY</u>

Generally, an inmate in state custody pursuant to the judgment of a state court must seek redress in the federal system by filing a petition for *habeas corpus* relief under 28 U.S.C. § 2244, *et seq.*, the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). That statute, as amended by Congress in 1996, places exacting burdens on petitioners seeking such relief, both in terms of the procedural propriety and substantive merit of their claims. However, where a petitioner who has not yet been convicted in state court raises federal claims relating to his pretrial detention, the proper vehicle for such claims is 28 U.S.C. § 2241, the pre-AEDPA *habeas* statute. *Martinez v. Caldwell*, 644 F.3d 238, 242 (5th Cir. 2011); *Holley v. Texas*, 194 F.3d 1309 (5th Cir. 1999).

### 1. Timeliness under § 2241

Whereas the AEDPA generally requires that a petitioner bring his federal *habeas* claims within one year of the date on which his conviction or sentence becomes final, see 28 U.S.C. § 2244(d)(1)(a), § 2241 places no time limit on petitions seeking pre-conviction relief. See *Day v. McDonough*, 547 U.S. 198, 202 n. 1, 126 S.Ct. 1675 (2006) ("Until AEDPA took effect in 1996, no statute of limitations applied to *habeas* petitions."). Accordingly, Wilson's petition is timely filed.

### 2. Exhaustion & Procedural Default under §2241

Pursuant to 28 U.S.C. § 2254(b)(1)(a), a post-conviction petitioner seeking federal *habeas corpus* relief cannot collaterally attack his state court conviction in federal court until he has exhausted available state remedies. 28 U.S.C. § 2254(b)(1)(A); *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198 (1982); *Minor v. Lucas*, 697 F.2d 697 (5th Cir. 1983); *Mercadel v. Cain*, 179 F.3d 271, 275 (5th Cir. 1999); *Fisher v. Texas*, 169 F.3d 295, 302 (5th Cir. 1999); *Whitehead v.*

*Johnson*, 157 F.3d 384, 387 (5th Cir. 1998).  "To exhaust, a petitioner must have fairly presented the substance of his claim to the state courts." *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) (internal quotation marks omitted).

While § 2241 contains no express exhaustion requirement, the United States Fifth Circuit has held that, as a matter of comity, pretrial *habeas* petitioners must nonetheless exhaust their state remedies prior to seeking relief in federal court. See *Dickerson v. Louisiana*, 816 F.2d 220, 223 (5th Cir. 1987) ("[F]ederal courts should abstain from the exercise of that jurisdiction if the issues raised in the petition may be resolved either by trial on the merits in the state court or by other state procedures available to the petitioner.").

Without engaging in an extensive review of the record, it suffices to say that the claim presented in the instant petition was raised in a procedurally proper manner, either by Wilson or the State, in the Louisiana trial court, court of appeal, and supreme court, and was disposed of accordingly by those tribunals.  Consequently, Wilson's sole claim has been properly exhausted and may be addressed on its merits.

<u>MERITS REVIEW UNDER § 2241</u>

As noted above, Wilson bases his entitlement to *habeas* relief on his claim that the state courts erred in denying his motion to quash because the state trial court's granting of a mistrial after the jury had been sworn due to the physical impossibility of proceeding without the State's primary witness violated his right against double jeopardy as secured by the federal Constitution.

**1.  Standard of Review**

Unlike the AEDPA, which establishes a highly deferential standard for reviewing state court judgments, pretrial judgments are reviewed *de novo* under §2241. *Martinez*, *supra*, at 242.

2. **Law & Argument**

    a. **Mistrial & Double Jeopardy Generally**

In *Martinez*, the United States Fifth Circuit discussed the federal jurisprudence relating to

mistrials and double jeopardy:

> The Fifth Amendment's Double Jeopardy Clause protects a criminal
> defendant from repeated prosecutions for the same offense. Under that
> clause, a defendant has the right "to have his trial completed by a
> particular tribunal." *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 93
> L.Ed. 974 (1949). More specifically, a defendant has a right to a complete
> trial by the jury first selected and impaneled. See generally *United States
> v. Scott*, 437 U.S. 82, 93–94, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978). When a
> defendant's first trial is terminated prior to verdict, the circumstances of
> the termination determine whether the Fifth Amendment bars retrial. If the
> trial is terminated over defense objection, retrial is prohibited absent
> "manifest necessity." [*Oregon v.*] *Kennedy*, 456 U.S. [667,] 672, 102 S.Ct.
> 2083. A hung jury is "the prototypical example" of manifest necessity. *Id.*

644 F.3d at 242-43.

In providing an exception to the categorical barring of retrial following an objected-to

mistrial, the Supreme Court has signaled that "[t]he Double Jeopardy Clause…does not offer a

guarantee to the defendant that the State will vindicate its societal interest in the enforcement of

the criminal laws in one proceeding." *Oregon v. Kennedy*, 456 U.S. at 672. See *Wade v. Hunter*,

336 U.S., at 689 (noting that if retrial were categorically prohibited, "the purpose of law to

protect society from those guilty of crimes frequently would be frustrated by denying courts

power to put the defendant to trial again."). Indeed, in a seminal mistrial-related double

jeopardy decision, the Supreme Court emphasized that:

> [R]etrial is not automatically barred when a criminal proceeding is
> terminated without finally resolving the merits of the charges against the
> accused. Because of the variety of circumstances that may make it
> necessary to discharge a jury before a trial is concluded, and because those
> circumstances do not invariably create unfairness to the accused, his
> valued right to have the trial concluded by a particular tribunal is
> sometimes subordinate to the public interest in affording the prosecutor

one full and fair opportunity to present his evidence to an impartial jury.

*Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824 (1978).

To that end, while the prosecution bears the burden of demonstrating a "high degree" of necessity for the complained-of mistrial, *id*., at 506, the Court noted that the phrase "manifest necessity" "[does] not describe a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge.  Indeed, it is manifest that the key word 'necessity' cannot be interpreted literally." *Ibid*.  Relevant to the instant case, the Court has found that "the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence." *Id*., at 508.  As an example, the Court explained that where "a prosecutor proceeds to trial aware that key witnesses are not available to give testimony and a mistrial is later granted for that reason, a second prosecution is barred." *Id*., at n.24 (citing *Downum v. United States*, 372 U.S. 734, 83 S.Ct. 1033 (1963)).  However, the Court has "refuse[d] to say that the absence of witnesses 'can never justify discontinuance of a trial.'" *Downum*, at 737 (quoting *Wade*, 336 U.S. at 691).  For example, "[i]n some circumstances, such as sudden illness or other involuntary absence, the fact that the key witness will later be available justifies the delay and other burdens that a mistrial imposes on the defendant." *United States v. Stevens*, 177 F.3d 579, 588 (6th Cir. 1999).

Indeed, in light of the innumerable factors and circumstances that bear on the daily functioning of the modern justice system, the Supreme Court has observed:

> [A] criminal trial is, even in the best of circumstances, a complicated affair to manage. The proceedings are dependent in the first instance on the most elementary sort of considerations, e.g., the health of the various witnesses, parties, attorneys, jurors, etc., all of whom must be prepared to arrive at the courthouse at set times. And when one adds the scheduling problems arising from case overloads, and the Sixth Amendment's requirement that the single trial to which the double jeopardy provision restricts the Government be conducted speedily, it becomes readily apparent that a

> mechanical rule prohibiting retrial whenever circumstances compel the discharge of a jury without the defendant's consent would be too high a price to pay for the added assurance of personal security and freedom from governmental harassment which such a mechanical rule would provide.

*United States v. Jorn*, 400 U.S. 470, 479-80, 91 S.Ct. 547 (1971). "For this reason, when courtroom errors or other developments at trial make a just judgment impossible, the public's interest in maintaining the integrity of the criminal justice system will outweigh the defendant's right to obtain a judgment, and the court may terminate the trial without the defendant's consent and without foreclosing reprosecution." *Douglas v. United States*, 488 A.2d 121, 131 (D.C. 1985).

Strict scrutiny of mistrials based on unavailable prosecution witnesses "requires the government to show that the district court carefully considered whether reasonable alternatives existed and that the court found none." *United States v. Fisher*, 624 F.3d 713, 722 (5th Cir. 2010). However, having done so, "[o]nce a trial court has declared a mistrial on manifest necessity grounds…the reviewing court [is] to give great deference to the trial court's decision." *Holley*, *supra*, at 1309 (citing *Cherry v. Director, State Bd. of Corrections*, 635 F.2d 414, 418 (5th Cir. 1981)). In such cases, the trial court's finding of manifest necessity should be upheld on review so long as it is reasonable. See *Illinois v. Somerville*, 410 U.S. 458, 459, 93 S.Ct. 1066 (1973).

**b. Wilson's Claim**

Wilson relies on *Downum* in arguing that the state trial court's granting of a mistrial, over his objection, based on the unavailability of the State's key witness, caused jeopardy to attach in this matter, thereby barring retrial outright. Wilson also cites to *Cornero v. United States*, 48 F.2d 69 (9th Cir. 1931), in which the Ninth Circuit held that the absence of a witness can never justify a mistrial sufficient to excise a later retrial from the strictures of the Double Jeopardy

Clause, and notes that the language of *Cornero* was relied upon by the *Downum* Court.  Finally, Wilson directs this Court to *Walck v. Edmondson*, 472 F.3d 1227 (10th Cir. 2007), a case "remarkably similar", in his words, to the instant one, in which the Tenth Circuit found retrial to be barred by double jeopardy where prosecutors were deemed to have assumed the risk that their key witness, who was eight-and-a-half months pregnant, might go into labor during trial, causing a mistrial.

Wilson's reliance on the above cases is misplaced and misguided, however.  As an initial matter, and salient to the issue before this Court, each of the cases cited by Wilson in support of his claim—*Cornero*, *Downum*, *Walck*, and *Youngblood*—involved a specific request by the prosecution that a mistrial be granted or the jury be otherwise discharged.  To the contrary, in the instant case the State consistently and specifically asked only for a *recess* of the trial. See Rec. Doc. 4, Ex. 1-E, 6/7/11 Transcript, p. 8 ("[ASST. DIST. ATTY.]: And Judge, I would just like for the record to be clear…We're asking that [the trial] be recessed."); *id.*, Ex. 1-F, 6/9/11 Transcript, p. 15 ("[ASST. DIST. ATTY.]: Yes, Your Honor.  We are asking for a recess.").  Under Louisiana law, a "recess" is specifically defined as "a *temporary adjournment* of a trial or hearing that occurs after a trial or hearing has commenced." La. Code Crim. Pro art. 708 (emphasis added). To be certain, the State *never* once requested a mistrial; rather, the trial court, feeling nothing else could be done, declared a mistrial *ex proprio motu*.

In any event, contrary to Wilson's declarations, the facts of *Cornero*, *Downum*, and *Walck* are not "remarkably similar" to those in the instant matter.  Unlike in those cases, the prosecution herein did not declare ready for trial aware that its primary witness was unavailable; rather, at all times, prosecutors reasonably relied on J.T.'s timely appearance to testify.  To that end, Lisa Thornton testified at the June 9 motion hearing that when she and Brian Lapeyrolerie arrived in

Clovis, New Mexico, to escort J.T. to New Orleans for trial, J.T. was packed and ready to go and assured the investigators that she was willing to accompany them to Louisiana.[34]  J.T. provided a note from her doctor indicating that she was medically cleared to travel.[35]  While the State had previously obtained a material witness bond for J.T., the trial court noted that the bond was never filed in New Mexico because J.T. was voluntarily accompanying the district attorney's investigators to New Orleans.[36]  J.T.'s recently aborted flights to New Orleans were due either to unforeseen car and money issues, both of which the State diligently worked to resolve expediently, or to conditions related to her pregnancy.  In neither event were prosecutors ever on notice that J.T. actively sought to avoid coming to New Orleans or that her appearance was unlikely.

The instant situation is decidedly different from that confronting the Court in *Downum*. While in both cases there was a failure to properly serve the nonappearing witnesses in question, the discharge of the jury in *Downum* was additionally found to be improper "because no other arrangements had been made to assure his presence." 372 U.S. at 737.   Moreover, the government's witness in that case had not even been located.   As detailed above, J.T. had clearly been located by the time of trial and the State went to great lengths beyond the routine issuance of a subpoena to insure her appearance, including, as the trial court noted, "sen[ding] two investigators across several states…[to] Clovis, New Mexico" to escort her to New Orleans.[37] Moreover, as will be discussed in further detail below, the circumstance that ultimately prevented J.T. from appearing at trial was something far beyond the power of the State of Louisiana to control, completely unrelated to, and irremediable by, the "district attorney's obligation to

---

[34] See Rec. Doc. 4, Ex. 1-F, p. 24, 30.
[35] *Id*., at 24.
[36] *Id*., at 27-28, 29.
[37] *Id*., at 27-28.

prepare its cases for trial."[38]

Moreover, as the dissent in that case noted, the *Downum* majority relied on *Cornero*'s language regarding the absence of witnesses as *per se* improper grounds for a mistrial under the Double Jeopardy Clause in spite of the fact that the Court had already, some 14 years earlier, "refused to follow the *Cornero* rule, which was characterized as holding that the absence of witnesses was not such an 'imperious' or 'urgent necessity' as to come within the recognized exception to the double jeopardy provision." 372 U.S. at 740 (CLARK, J., joined by HARLAN, STEWART, and WHITE, JJ., dissenting). See *Wade*, *supra*, 336 U.S. at 691 ("We are asked to adopt the *Cornero* rule under which petitioner contends the absence of witnesses can never justify discontinuance of a trial. Such a rigid formula is inconsistent with the guiding principles…to which we adhere.").   In any event, as with *Downum*, the factual scenario confronting the Court of Appeals in *Cornero* is critically different from that in the instant case.

Finally, in *Walck*, the prosecution moved for a mistrial following the swearing of the jury and the testimony of two witnesses in the defendant's manslaughter trial because its third witness, who was eight-and-a-half months pregnant at the time of trial, had gone into labor.  The federal district court granted *habeas* relief under § 2241 on double jeopardy grounds and the Tenth Circuit affirmed based on four considerations: (1) the unavailable witness's testimony was not absolutely necessary to the State's case because another witness could testify to essentially the same facts and the unavailable witness's pretrial hearing testimony was available as evidence; (2) the prosecution proceeded to trial with the "known risk" that the witness, eight-and-a-half months pregnant, might go into labor; (3) the trial court's reason for granting the mistrial was insufficient to show "manifest necessity"; and (4) the trial court did not sufficiently consider viable alternatives to a mistrial prior to ruling.

---

[38] Rec. Doc. 4, p. 9.

In light of the *Walck* court's reasoning, it is evident that the facts of this case do not demand a similar outcome.  First, J.T. is the sole victim of Wilson's string of crimes (with the technical exception of false personation of a peace officer).  To that end, Wilson has not demonstrated that her testimony could be approximated by another other potential witness.  Nor is there any reflection in the record that J.T. testified at any pretrial hearing, which is unlikely given Louisiana's stringent protections of crime victims from compelled pretrial confrontation with the accused. See *State v. Harris*, 998 So.2d 55 (La. 2008) (Because defendant's right to confront accusers does not attach until trial, he must demonstrate "good cause" in order to subpoena victim to testify at pretrial hearing).  The trial court's finding that J.T.'s testimony was "essential" is thus unimpeached.[39]

Second, the instant prosecutors did not proceed to trial with the "known risk" that J.T. would be unavailable for trial.  While it is reasonably foreseeable that a witness who is two weeks from her due date may go into premature labor, it is not reasonably foreseeable that someone still in her first (or early second) trimester would be rendered unavailable due to pregnancy-related concerns.  Even less foreseeable is an ectopic pregnancy, which is, by definition, a medical emergency—i.e. "an unforeseen combination of circumstances or the resulting state that calls for immediate action."[40] See *Stevens*, *supra*, 177 F.3d at 588.  Until Dr. Alexander called J.T. as she and the district attorney investigators were leaving Clovis, no one involved in the case—including J.T. herself—was aware of the circumstances that would require her to be unavailable for trial.  To this end, the trial court correctly noted that J.T.'s ectopic pregnancy would only have been foreseeable to someone with a "crystal ball."[41]  Certainly, that

---

[39] *Id.*, Ex. 1-F, 6/9/11 Transcript, p. 35.
[40] Source: Merriam-Webster Online Dictionary, available at: http://www.merriam-webster.com/dictionary/emergency (last accessed 2/28/12).
[41] Rec. Dc. 4, Ex. 1-F, 6/9/11 Transcript, p. 34-35.

knowledge cannot fairly be imputed to the prosecutors in New Orleans.  In this light, the instant case is readily distinguishable from *Walck*.

Third, the instant trial court's reasons for declaring a mistrial were substantial and more than sufficed to demonstrate "manifest necessity."  Initially, it is noted that the court declared the mistrial under subsection 5 of La. Code Crim. Pro. art. 775, finding that proceeding to trial in accordance with the law would be "physically impossible" given J.T.'s condition. See *id*.  Surely, it is manifestly necessary to discontinue a trial that is physically impossible to conduct. Moreover, the court's reasons for finding physically impossibility are supported by the record. As noted, J.T., an essential witness, had been suddenly hospitalized due to an emergency that posed "a great, grave danger" to her wellbeing, and would be "risking her life by not being hospitalized."[42]   The trial judge, Karen Herman, noted that she had an experiential basis for making such a finding, having personally known people who had experienced ectopic pregnancies.[43]  In other words, an attempt by J.T. to testify at that time might literally have killed her.  Furthermore, as it was unknown when J.T. would be sufficiently recovered from surgery to travel to New Orleans to testify, the court found that it was unfeasible to keep the trial jury— subpoenaed for only one month at a time—sitting in limbo "for an indefinite number of days" on a single trial.[44]  Thus, the court reasonably determined that neither proceeding to, nor indefinitely recessing, the trial was feasible.

Finally, the trial court considered the alternative of merely recessing the case—as the State had requested—but ultimately decided against it due to the unknown amount of time that J.T. would be unavailable.  As likewise noted above, proceeding to trial without an essential witness was equally unfeasible, especially as there is no evidence that either another witness or

---

[42] *Id.*, at 35.
[43] *Ibid.*
[44] *Ibid.*

J.T.'s pretrial testimony could be substituted in her stead. Cf. *Walck*, 472 F.3d at 1240 ("As previously discussed, Mr. Kincade could have covered much of the ground to be covered by Ms. Moore's testimony; but, any gaps or inconsistencies in their respective stories could have been sufficiently filled and highlighted using Ms. Moore's preliminary hearing testimony."). Thus, the record reflects that the trial court engaged in "a careful consideration of any reasonable alternative to a mistrial." *Fisher*, *supra*, 624 F.3d at 722.

Clearly then, contrary to Wilson's apparent belief, the scenario confronting this Court is hardly "remarkably similar" to that in *Walck*, and the two cases are in fact easily distinguishable. This case is also discernable from those in which other federal circuits have found a trial court's reasons for granting a mistrial insufficient to constitute "manifest necessity."

In *Mizell v. Attorney General of the State of New York*, 586 F.2d 942, 943 (2d Cir. 1978), the prosecutor, after the jury had been sworn in, moved for a recess of trial based on the nonappearance of two State witnesses, whom he anticipated would be available in five days. When this request was denied by the trial judge, due to the inconvenience the five-day delay would cause the jury, the prosecutor moved for a mistrial, which was granted. In upholding the *habeas* court's granting of relief based on double jeopardy, the Second Circuit concluded that the mistrial was not manifestly necessary given the expected reappearance of the witnesses in less than a week and the minimal inconvenience caused to the jury by a delay of such short duration.

In *United States v. Rivera*, 384 F.3d 49, 52 (3d Cir. 2004), trial was adjourned over the weekend in the midst of a government witness's direct examination. The witness, who lived in another state, travelled home, where he suffered a broken leg which required hospitalization and surgery. On the next trial date, the trial court granted the prosecutor's request to recess the proceedings for two days, when it was expected the witness would be able to return following

his discharge from the hospital.  Two days later, the court granted another four day recess, as the witness was not yet cleared to travel.  At the next setting, the prosecutor informed the court that the witness had been barred from boarding his flight to return to trial because he did not have a doctor's waiver for his medication, which he could not obtain until the next morning.  Based on the length of time that had elapsed since the witness first took the stand, and the possible attendant effects of that delay on the jury's ability to recall his testimony, the trial court, *sua sponte*, declared a mistrial.  In reversing the trial court's denial of Rivera's ensuing motion to dismiss, the Third Circuit found that the witness's broken leg and his temporary inability to obtain a waiver to fly with his medication did not amount to "manifest necessity" requiring a mistrial.  Nor was there any support for the trial court's finding that the jury would be prejudiced by the weeklong delay in the witness's testimony.

The instant case presents far graver and less predictable circumstances—a sudden, life-threatening medical condition and a post-surgical convalescence of inderminate duration—than either *Mizell* or *Rivera*.  Rather, the facts herein more closely resemble those confronting the Third Circuit in *United States ex rel. Gibson v. Ziegele*, 479 F.2d 773 (3d Cir. 1973), in which a key prosecution witness suffered a sudden "intestinal grippe with acute coronary insufficiency" in the midst of trial, rendering him unavailable to testify for one-to-two weeks or more. Applying the standards of "manifest necessity" and "public justice", the Third Circuit affirmed the district court's granting of a mistrial over the defendant's objection, finding that "[the unavailable witness's] testimony was essential and his sudden illness justified the declaration of a mistrial." 479 F.2d at 777.  The Supreme Court subsequently denied the defendant's petition for certiorari. *Gibson v. Ziegele*, 414 U.S. 1008, 94 S.Ct. 370 (1973).

Similarly, in *United States v. Shaw*, 829 F.2d 714 (9th Cir. 1987), an essential prosecution

witness in the defendant's bank robbery trial informed the trial court the day before testimony began that she would invoke her Fifth Amendment right against self-incrimination when called to the stand due to unrelated drug charges pending against her in the same court.   Trial was continued and prosecutors secured immunity for the witness the same day.   When trial commenced the next morning, the court granted the government's order compelling the witness to testify, and, in her opening statement, defense counsel discussed the portions of the witness's expected testimony that were favorable to her client.   When called to testify, however, the witness once again refused.   Arguing that they were prejudiced by their inability to rebut the defendant's one-sided presentation of the witness's expected testimony to the jury, prosecutors moved for a mistrial, which was granted over Shaw's objection.   The Ninth Circuit affirmed the granting of the mistrial as "manifest necessity", noting the prosecution's diligent efforts to secure the witness's testimony, the witness's unexpected refusal to testify after the grant of immunity, and the prejudice attending to the government's case due to her refusal to do so.   The Court of Appeals further credited the trial judge's determination that nothing short of a mistrial would cure the prejudice in question, stating: "we decline to substitute our judgment for his." 829 F.2d at 720.

Ziegele and Shaw illustrate instructive points of comparison with the instant case.   The critical factors for the Third and Ninth Circuits in determining that the mistrial granted in each instance was required by "manifest necessity" included (1) the sudden and unexpected unavailability of an essential witness, be it to medical emergency or invocation of an inviolable constitutional right; (2) the diligent attempts by the prosecution to secure the witness's testimony; (3) the prejudice attending the witness's absence from trial; and (4) the absence of viable alternatives to a mistrial.   Each of those factors was found to be present by the state trial

court in the instant matter, and this Court, like the Ninth Circuit, should not substitute its judgment for that of Judge Herman.

Finally, Wilson presents *Wade v. Hunter*, *supra*, as only case in which the Supreme Court has found a witness's absence to constitute "manifest necessity" supporting the granting of a mistrial without barring subsequent retrial.  In that case, the court-martial of Wade, an American soldier accused of raping a German woman in Krov, Germany, during the closing stages of the Second World War, was transferred between succeeding army units due to the rapid advance of the defendant's infantry division, which had moved some 22 miles between the first and second days of trial, thereby putting the victim's parents, whom the court sought as witnesses, out of practicable reach of the tribunal under the circumstances of the time.  When the commanding general ordered the court-martial to start anew before another army unit located closer to Krov, Wade moved for dismissal based on double jeopardy, which was denied.  After his conviction, Wade sought *habeas* relief, which was granted by the federal district court.  The Court of Appeals reversed and the Supreme Court affirmed, holding that "the tactical situation brought about by a rapidly advancing army was responsible for withdrawal of the charges from the first court-martial," 336 U.S. at 691, and that this constituted "manifest necessity" permitting both mistrial and retrial.

Wilson appears to suggest that *Wade* somehow establishes that nothing short of "an advancing army" will constitute the requisite "manifest necessity" permitting the retrial of a defendant following the granting of a mistrial over his objection.  However, in so arguing, Wilson misses the point of *Wade*—indeed, of all of the federal jurisprudence on this issue since *United States v. Perez*, 22 U.S. 579, 9 Wheat. 579 (1824)—entirely.  In *Perez*, the Supreme Court famously noted:

> [Judges] are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes…But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office.

22 U.S. at 580.

The *Wade* Court echoed this sentiment:

> The rule announced in the *Perez* case has been the basis for all later decisions of this Court on double jeopardy. It attempts to lay down no rigid formula. Under the rule a trial can be discontinued when particular circumstances manifest a necessity for so doing, and when failure to discontinue would defeat the ends of justice.

336 U.S. at 690.

Thus, quite contrary to Wilson's position, there is no rigid dictate that any intrusion short of a rapidly advancing army is categorically insufficient to merit a mistrial permitting retrial of the defendant.  Rather, as the Court has made abundantly clear, "[e]ach case must turn on its facts." *Downum*, *supra*, 372 U.S. at 737.

The facts of this case clearly demonstrate "manifest necessity" for the mistrial ordered by the state trial court herein, thereby permitting Wilson's retrial on the pending charges.  The State diligently attempted to insure J.T.'s appearance at trial and, as of June 2, 2011, the date prosecutors declared ready, they were neither aware, nor had any reason to be aware, that she would not be available to give testimony.  The evidence in fact demonstrates that J.T. was voluntarily en route to New Orleans for trial when she was advised by her physician that she was suffering an ectopic pregnancy, a life-threatening medical emergency that required immediate surgery, a fact of which no amount of diligence could have permitted prosecutors to be aware.  Furthermore, there was no estimated timeline for J.T.'s post-surgical recovery and thus no

anticipated date on which she would become available to testify.  Based on the above, and after considering the alternative of an indefinite recess, which would effectively leave the trial jury in an indefinite state of limbo, the trial court determined that continuing with trial as scheduled would be a physical impossibility, and, therefore that mistrial was the only viable option.

This is not a case where the State simply went to trial with insufficient evidence or aware that its chief witness would likely not be present to testify.  Rather, this is precisely a scenario in which the defendant's "valued right to have the trial concluded by a particular tribunal is… subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury." *Arizona v. Washington*, *supra*, at 505.  To that end, the record, even viewed with strict scrutiny, supports the state court's determination that "manifest necessity" required the mistrial ordered herein and, consequently, that double jeopardy does not bar Wilson's retrial for the charged offenses.  In light of the great deference owed to that ruling, it cannot be said that the state court's actions were unreasonable. See *Illinois v. Somerville*, 410 U.S. at 459.

Accordingly, Wilson's claim is without merit and he is not entitled to relief under 28 U.S.C. § 2241.

<u>CONCLUSION</u>

Based on the foregoing, the State of Louisiana submits that petitioner Eric Wilson's claim for *habeas corpus* relief is without merit.  His petition should therefore be denied with prejudice.

Respectfully Submitted,

/s/Andrew M. Pickett
Andrew M. Pickett
La. Bar No. 31386
Assistant District Attorney

Parish of Orleans

619 South White Street
New Orleans, Louisiana 70119
Tel: (504) 571-2941
Email: apickett@orleansda.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing motion has been served upon the below-listed counsel for the plaintiff/petitioner and the defendant through this Court's online CM/ECF system, this **29th** day of **February**, **2012**:

**Mr. Colin Reingold, Esq.**
Orleans Public Defender's Office
2601 Tulane Avenue
Suite 700
New Orleans, LA 70119

**Ms. Jee Y. Park, Esq.**
Orleans Public Defender's Office
2601 Tulane Avenue
Suite 700
New Orleans, LA 70119

*Counsel for plaintiff/petitioner Eric Wilson*

**Mr. Timothy R. Richardson, Esq.**
Usry, Weeks & Matthews
1615 Poydras St.
Suite 1250
New Orleans, LA 70112

**Mr. Freeman Rudolph Matthews, Esq.**
Usry, Weeks & Matthews
1615 Poydras St.
Suite 1250
New Orleans, LA 70112

*Counsel for defendant Marlin Gusman, Sheriff*

/s/ Andrew M. Pickett
Assistant District Attorney
Parish of Orleans