UNITED STATES  DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

ERIC WILSON #2249777                          CIVIL  ACTION

VERSUS                                        NO.  12-0386

MARLIN GUSMAN                                 SECTION  F (3)

ORDER AND REASONS

Before the Court is Eric Wilson's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241.  For the reasons that follow, the petition is DENIED with prejudice.

Background

Eric Wilson is a Louisiana pretrial detainee currently awaiting trial on charges of forcible rape, armed robbery, false impersonation of a peace officer, and second-degree kidnapping.  He has been detained in Orleans Parish Prison since his arrest on May 5, 2010.[1]

Wilson's trial was scheduled to begin on June 2, 2011 in Orleans Criminal District Court, Section I, Judge Karen K. Herman presiding.  On that day, counsel for both sides announced that they were ready.  Voir dire was conducted, and a jury was selected and sworn.  At the completion of jury selection, the trial judge announced that the trial was in recess until Tuesday, June 7,

_____

[1]He was charged by bill of information on July 7, 2010 with forcible rape, armed robbery, false impersonation of a police officer, and second-degree kidnapping.

1

2011.[2]

 Meanwhile, on June 2, 2011 -- the day the jury was selected -- the complaining victim, J.T., a New Mexico resident, was not present in Louisiana.  The State had attempted to secure J.T.'s presence by buying her an airline ticket for a flight to New Orleans on June 2, 2011.  Before the flight, however, the State represented that it was advised that J.T. was experiencing a pregnancy-related illness, which made her fearful of flying;[3] accordingly, the State bought her another ticket for a flight to New Orleans two days later on June 4, 2011.  However, on June 4, J.T. again informed the State that she was experiencing pregnancy-related health concerns and was too scared to get on a plane; she missed that flight too.  The State then purchased a third plane ticket for her and for a companion; that flight was scheduled to leave the next day, on Sunday, June 5, 2011.  On that date,

---

 [2]The trial judge's reasoning for ordering a recess after jury selection on June 2 was as follows:

> At that time, based on the fact that this is a brand new jury pool; it was the very first day of jury service for these jurors; anticipating that they may be tired from the full day length of jury selection, it was this Court's decision to recess until their next scheduled jury day, which is...June 7th.

Transcript from June 7, 2011 hearing on the State's request for a recess.

 [3]J.T.'s fiancé contacted the State to inform it that she was afraid to fly because of her condition.

however, J.T. called and told counsel that her car had broken down 20 minutes from the airport.  Even though the State arranged for a taxi cab to pick up J.T. and her traveling companion, when the two arrived at the airport and J.T. was told she would have to pay a fee for her luggage, J.T. declined (or was unable) to pay the fee. She did not get on the plane.  After missing the third flight, the State, to secure J.T.'s appearance, moved for a certificate of materiality, pursuant to La.C.Cr.P. art. 741, which was granted by the court on Sunday, June 5, 2011.[4]

J.T. was not present in court when trial resumed on June 7, 2011.  On that day, the State requested a recess, indicated that it planned to secure J.T.'s presence by sending personnel to New Mexico and placing her in custody, and tried to produce J.T. by June 9, 2011.  The State represented on the record that, while J.T.

---

[4]Louisiana Code of Criminal Procedure article 741 provides:

> If a person in any state, which by its laws has made provision for commanding persons within its borders to attend and testify in criminal prosecutions or grand jury investigations commenced or about to commence in this state, is a material witness in a prosecution pending in a court of record in this state,...a judge of such court may issue a certificate under the seal of the court stating these facts and specifying the number of days the witness shall be required.  This certificate shall be presented to a judge of a court of record in the county (parish) in which the witness is found.

La.C.Cr.P. art. 741.  The certificate was never filed in a New Mexico court.

had claimed that she was three or four months pregnant, the State had not verified that fact.  Over the defendant's objection, the trial court granted the State's request for a two-day recess to resume the trial on Thursday, June 9, 2011.  But J.T. again failed to appear in court on June 9.

When the State again moved for a recess, this time an indefinite one, the judge held an evidentiary hearing, and instructed the State to call witnesses to testify as to the details of the efforts the State had made to secure the presence of J.T. Lisa Thornton, an investigator for the district attorney's office, testified; she stated that she, along with another investigator, had flown to New Mexico on June 8 to escort J.T. to New Orleans. The investigators and representatives of the Clovis, New Mexico Sheriff's Office drove to J.T.'s residence.  J.T.'s mother told Ms. Thornton that J.T. was at a doctor's appointment getting some lab work done because she was having some complications.  Ms. Thornton then got in touch with J.T. about an hour later when J.T. got home from her appointment; J.T. told Ms. Thornton that she was having complications with her pregnancy, but that she was willing to accompany them back to New Orleans; she just wanted to wait for her lab results.  About 30 minutes after the investigators had made contact with J.T., J.T. had finished packing and gotten into the vehicle with Ms. Thornton when the doctor's office called her.  The nurse on the phone (with whom Ms. Thornton also spoke) said that

J.T.'s test results were in, and that J.T. needed to get back to the women's clinic immediately, for her safety.  Once there, Ms. Thornton was informed by Dr. Lonnie Alexander that J.T. had an ectopic pregnancy, that he would be the admitting doctor, and that she would be admitted into the hospital immediately so that she could undergo surgery.

After the June 9, 2011 evidentiary hearing on the motion for an indefinite recess,[5] the court declared a mistrial, over the defendant's objection.  The court declared a mistrial on the basis that continuing the trial was "physically impossible."   In connection with that determination, the court made the following detailed observations:

> [B]ased on the unusual circumstances that have taken place in this case – I'd just like to clarify a couple of things for the record. [The judge then gives a background of the proceedings leading up to the motion for an indefinite recess.]
> [B]ased on the physical emergencies that were not foreseen by anyone – unless they had a crystal ball – that [J.T.] has an ectopic pregnancy, and that she's risking her life by not being hospitalized with the ectopic pregnancy.  I know people that have had those types of pregnancies, and it is a great, grave danger to [J.T.].  And I'm also aware of the fact that she's in emergency surgery today, based on what Ms. Thornton put on the record, as well as what the State put on the

_____

[5]During the evidentiary hearing, counsel for the State represented to the court that the State could not suggest a duration as to the requested recess, given that the State did not know whether there would be any complications with the surgery, did not know whether the surgery would be laparoscopic or the more invasive full abdominal surgery, and that the State's research indicated that J.T.'s hormone levels would have to be monitored after the surgery.

record.
  Based on the fact that we have no idea when [J.T.] is going to convalesce and be able to travel across state lines to get to New Orleans for her essential testimony in this case; it seems prudent to recess this case to the end of June.
  Because there's no way to know when [J.T.] is going to be healthy enough [sic] travel.  And it's unfair to the jury that's been sworn to have this case hanging over their heads for some indeterminate number of days in June.  It's unfair to Mr. Wilson to have to wait for this case to begin, not knowing what's going to happen.  And it's unfair to the State.
  ...Based on my review of the Code of Criminal Procedure, Article 775, subsection 5, I do find that it is physically impossible to proceed with this trial at this time.  And I do find that, in the interest of justice, the most fair decision I can make at this point, is on my own motion to declare a mistrial, pursuant to article 775.
  And additionally, I've had the opportunity to review case law that could be found in regards to this very unusual set of circumstances.  And I'll note for the record that I'm relying on <u>State v. Moten</u>, 510 So.2d 55, as well as <u>State v. Albert</u>, 381 So.2d 424, and <u>State v. Picchini</u>, 463 So.2d 714.  That's the decision of this court.  This case is now mistried.  Additionally, I'm denying the defense's motion to quash the bill of information....

On July 26, 2011 counsel for Wilson moved to quash the bill of information on the ground that any future trial would violate Wilson's rights under the Double Jeopardy Clauses of both the U.S. and state constitutions.  The motion was denied.  Wilson appealed. On November 15, 2011 the Louisiana Fourth Circuit Court of Appeal granted Wilson's writ application with a written decision in which the appellate court reversed the trial court's denial of Wilson's motion to quash; the intermediate appellate court ordered that Wilson be released from custody.  The State filed a writ

application to the state supreme court that same day.   The
Louisiana Supreme Court stayed Wilson's release and, on December
16, 2011, the high court reversed the intermediate court and denied
Wilson's double jeopardy claim; the high court wrote:

> Writ Granted.   The ruling of the Court of Appeal is
> reversed.   Considering the unusual facts in this case,
> especially that the State's prime witness had to undergo
> emergency surgery and would risk her life in attempting
> to come to Louisiana to testify in this case, the trial
> court did not abuse its discretion in granting a
> mistrial.   Therefore, the ruling of the trial court
> denying the double jeopardy motion is reinstated and the
> case is remanded to the trial court for further
> proceedings.

On remand, the trial court rescheduled Wilson's trial for March 20,
2012.  Wilson now seeks habeas relief, in which he urges this Court
to order his release on the ground that any future trial is barred
by the Double Jeopardy Clause of the Fifth Amendment of the U.S.
Constitution.

I.
*A.*

Congress has vested federal courts with the power to issue
pretrial habeas corpus relief when a petitioner, who has not yet
been convicted in state court, "is in custody in violation of the
Constitution or laws or treaties of the United States."  28 U.S.C.
§ 2241(c)(3).  Wilson's petition for relief falls under 28 U.S.C.
§ 2241 because he is a pre-trial detainee.  <u>See</u> <u>Dickerson v.
Louisiana</u>, 816 F.2d 220, 224 (5th Cir. 1987)(citing <u>Braden v. 30th
Judicial Circuit Court of Kentucky</u>, 410 U.S. 484, 503-04, 93 S.Ct.

7

1123, 1133-34, 35 L.Ed.2d 443 (1973)).

*B.*

Unlike the Anti-Terrorism and Effective Death Penalty Act of 1996, which establishes a highly deferential standard for reviewing state court judgments, this Court reviews pretrial judgments *de novo* under Section 2241.  See Martinez v. Caldwell, 644 F.3d 238, 242 (5th Cir. 2011)(considering, as a matter of first impression, whether de novo review or a more deferential standard of review applies to Section 2241 petitions and holding that "the district court did not err by conducting a *de novo* review of Martinez's state court proceedings and we apply the same standard when reviewing his petition under § 2241.").[6]

*C.*

The following issues are undisputed: (1) Wilson's petition is timely;[7] and (2) Wilson has exhausted his state court remedies with

_____

[6]In Martinez, the Fifth Circuit agreed with the First, Ninth, and Tenth Circuits that held that Section 2254(d) deference never applies to habeas petitions brought by pretrial detainees. Id. ("The deferential standard afforded to state court decisions, which is specifically articulated in § 2254, is not included in the text of § 2241.").  The Fifth Circuit affirmed the district court's application of a de novo review of Martinez's state court proceedings, but in conducting its own de novo review, the U.S. Court of Appeals for the Fifth Circuit vacated the district court's order (that had granted the habeas petition) and denied the habeas petition on the merits. Id. at 242-44.

[7]Section 2241 places no time limit on petitions seeking pre-conviction relief. See Day v. McDonough, 547 U.S. 198, 202 n.1 (2006)("Until the AEDPA took effect in 1996, no statute of limitations applied to habeas petitions").  While the AEDPA, as amended, places burdens on petitioners seeking relief in the

respect to the Double Jeopardy issue presented to this Court.[8]

## II.
### A.

The Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution commands in part that "nor shall any person be twice put in jeopardy of life or limb." U.S. CONST. amend. V.    Most clearly, the Double Jeopardy Clause "unequivocally prohibits a second trial following an acquittal." Arizona v. Washington, 434 U.S. 497, 503 (1978).   The setting here differs; Wilson was not acquitted.

"Because jeopardy attaches before the judgment becomes final," the Supreme Court has observed, "the constitutional protection also embraces the defendant's 'valued right to have his trial completed by a particular tribunal.'" Arizona v. Washington, 434 U.S. 497, 503 (1978).  But nuances enter the picture.  Thus, "when a criminal proceeding is terminated without finally resolving the merits of the charges against the accused, retrial is not automatically

---

federal system, where a petitioner has not yet been convicted in state court raises federal claims, the proper vehicle for such claims is the pre-AEDPA habeas statute, 28 U.S.C. § 2241.  See Martinez v. Caldwell, 644 F.3d 238, 242 (5th Cir. 2011).

[8]While Section 2241 contains no express exhaustion requirement, the U.S. Court of Appeals for the Fifth Circuit has held that, as a matter of comity, pretrial habeas petitioners must nonetheless exhaust their state court remedies prior to seeking relief in federal court. See Dickerson v. Louisiana, 816 F.2d 220, 223-24 (5th Cir. 1987).  Here, Wilson's Double Jeopardy claim has been presented to and decided by the Louisiana trial court, state appellate court, and state supreme court.

barred." Id. at 505.   The Supreme Court has realistically explained why a rigid application of the "particular tribunal" principle is unacceptable:

> [A] criminal trial is, even in the best of circumstances, a complicated affair to manage.... [It is] readily apparent that a mechanical rule prohibiting retrial whenever circumstances compel the discharge of a jury without the defendant's consent would be too high a price to pay for the added assurance of personal security and freedom from governmental harassment which such a mechanical rule would provide.

Id. at 505 n. 16 (quoting United States v. Jorn, 400 U.S. 470, 479-480 (1971)).   In forgoing an absolute rule in favor of a more flexible standard, the Supreme Court opted for imposing a heavy burden on the prosecutor to demonstrate "manifest necessity" for a mistrial declared over the objection of the defendant:

> Because of the variety of circumstances that may make it necessary to discharge a jury before a trial is concluded, and because those circumstances do not invariably create unfairness to the accused, his valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury.   Yet in view of the importance of the right, and the fact that it is frustrated by any mistrial, the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar.   His burden is a heavy one.   The prosecutor must demonstrate "manifest necessity" for any mistrial declared over the objection of the defendant.

Id. at 505 (citation omitted).   In applying the "manifest necessity" standard, the Supreme Court cautioned that "it is manifest that the key word 'necessity' cannot be interpreted literally; instead, contrary to the teaching of Webster, we assume

there are degrees of necessity and we require a 'high degree' before concluding that a mistrial is appropriate." Id. at 506.[9] For example, the Fifth Circuit has found manifest necessity satisfied "where judge or juror cannot attend because of illness or death." See Cherry v. Director, State Bd. of Corrections, 635 F.2d 414, 419 (5th Cir. Jan. 1981), cert. denied, 454 U.S. 840, 102 S.Ct. 150, 70 L.Ed.2d 124 (1981).

In addition to the heavy burden borne by the prosecutor in demonstrating that a mistrial was manifestly necessary, the Court must focus on the basis for the mistrial; that is -- if the basis

---

[9]In Arizona, the Supreme Court invoked Justice Story's "classic formulation" of the test as helpful to guide courts in this task:

> We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes.... But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office.

Id. at 506 n. 18 (quoting United States v. Perez, 9 Wheat. 579, 580, 6 L.Ed. 165).

for the mistrial is the unavailability of critical prosecution evidence -- the "strictest scrutiny is appropriate." Id. at 508;[10] United States v. Fisher, 624 F.3d 713, 718-19 (5th Cir. 2010). Strict scrutiny of mistrials based on unavailable prosecution witnesses "requires the government to show that the district court carefully considered whether reasonable alternatives existed and that the court found none." Fisher, 624 F.3d at 722 (reversing the district court's finding of manifest necessity based on key witnesses' absences due to scheduling conflicts). Significantly, the Supreme Court has "refuse[d] to say that the absence of witnesses 'can never justify discontinuance of a trial[;]'" rather, "[e]ach case must turn on its facts." Downum v. United States, 372 U.S. 734, 737 (1963).

Mindful of these principles, the Court, conducting a *de novo* review, proceeds to address the merits of the petitioner's Double Jeopardy claim.

*B.*

It is this Court's task to determine whether Wilson's prosecution in the upcoming state court trial, in which Wilson faces charges of forcible rape, armed robbery, false impersonation

---

[10]The Supreme Court in Arizona noted, for example: "if...a prosecutor proceeds to trial aware that key witnesses are not available to give testimony and a mistrial is later granted for that reason, a second prosecution is barred." Id. at 508 n.24 (citing Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963)).

of a police officer, and second-degree kidnapping is barred by the Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution.  Wilson contends that the trial court's *sua sponte* declaration of a mistrial based on the unavailability of the State's witness was not manifestly necessary and, therefore, his upcoming trial violates his Constitutional rights.  The State (on behalf of Marlin Gusman) counters that the mistrial was manifestly necessary due to the sudden, emergency surgery of the victim herself, obviously an essential witness.[11]

Wilson seeks refuge in <u>Downum v. United States</u>, 372 U.S. 734 (1963).  In <u>Downum</u>, the jury was discharged because a prosecution witness, whose testimony was essential only for two of the six counts charged, had neither been served with a summons, nor had any other arrangements been made for his presence.  <u>Id.</u> at 737.  In fact, as the Supreme Court pointed out: "the prosecution allowed the jury to be selected and sworn even though one of its key witnesses was absent and had not been found."  <u>Id.</u> at 735.

Wilson also invokes <u>Walck v. Edmondson</u>, 472 F.3d 1227, 1239 (10th Cir. 2007).  In <u>Walck</u> -- the underlying criminal case involved a traffic accident for which the driver was charged with first-degree felony manslaughter -- the trial court declared a mistrial over the defendant's objection when a key government witness, who

---

[11]There is no dispute that jeopardy attached when the jury was sworn on June 2, 2011.

was eight and a half months pregnant when the trial began, went into labor.  Id.  The Tenth Circuit affirmed the district court's finding that discharge of the jury was not manifestly necessary and its order that the pending criminal charge should be dismissed with prejudice on double jeopardy grounds.  Id. at 1232.  The Tenth Circuit cited a number of reasons supporting its ruling, including that (1) the absent witness' live testimony was not absolutely necessary because she was not the only occupant in the vehicle at the time of the accident and the other occupant's testimony "considerably overlapped" with the absent witness' testimony; (2) that the prosecution proceeded to trial in the face of a known risk that the witness would be unavailable;[12] (3) the reason for the mistrial, which was so that the jury could hear from all the witnesses, was "innocuous"; and (4) the trial judge did not sufficiently consider the viable and reasonable alternatives, including utilizing the absent witness' preliminary hearing testimony or continuing the matter for a few days to allow the absent witness to recuperate from her C-section.  Id. at 1238-41.

The State contends that Downum is distinguishable because the government's witness in that case had not even been located.  Not only had J.T. been located, the State points out here, but the State went to great lengths beyond the routine issuance of a

_____

[12]The prosecutor was informed during voir dire that a medical emergency regarding one of its witnesses was developing and that her presence at trial might be problematic.  Id. at 1231.

14

subpoena to insure her presence, including sending investigators to
New Mexico to escort her to New Orleans.  The Court agrees.  In
Wilson's case, the State went to great lengths to assure J.T.'s
presence, including (as the record confirms) keeping in contact
with J.T. and her family, buying her plane tickets, paying for taxi
cabs, endeavoring to pay for luggage fees, and traveling to New
Mexico to escort her back to New Orleans.

    Walck is also distinguishable because the four considerations
the Tenth Circuit relied on in determining that habeas relief was
necessary are not present here.  It cannot be credibly disputed
that, given the nature of the charges, J.T. was the sole victim of
Wilson's alleged rape, armed robbery, and kidnapping.[13]  There is
nothing in the record to suggest that any other witness could
testify to the matters uniquely in J.T.'s experience; to the
contrary, as the motion for the appearance of an essential witness
confirms:

>      [J.T.] has never appeared in court in this matter nor has
>      she ever been deposed in this matter.  We do not have any
>      sworn testimony from [J.T.] as to this incident.
>      Additionally, there was no video or recording of this
>      incident and, as stated above, there are no other
>      witnesses to this incident....

Unlike Walck, the prosecution here did not proceed to trial with
the "known risk" that J.T. would require emergency surgery as a

---

    [13]The nature of the underlying charges is indeed spelled
out in the motion for appearance of an essential witness, which is
part of the record.

result of an ectopic pregnancy; such risks were unforeseeable and, as demonstrated by the record, required immediate action.  Judge Herman's reasons for granting the mistrial were sufficient to establish manifest necessity; the court's reasons for declaring that proceeding to trial was "physically impossible" are amply supported by the record, which this Court has reviewed in its entirety.  The trial judge noted that J.T., who was an essential witness and the only witness for most of the alleged charges against Wilson, was suddenly hospitalized due to "physical emergencies that were not foreseen by anyone – unless they had a crystal ball", a medical emergency that required surgery and posed "a great, grave danger" to J.T.'s well-being, and that J.T. would be "risking her life by not being hospitalized."  Additionally, the trial court clearly considered other alternatives on June 9, when she was considering the State's request for an "indefinite recess"; Judge Herman noted that, under these "unusual circumstances":

> Based on the fact that we have no idea when Ms. Tucker is going to convalesce and be able to travel across state lines to get to New Orleans for her essential testimony in this case; it seems prudent to recess this to the end of June.
> Because there's no way to know when Ms. Tucker is going to be healthy enough to travel.  And it's unfair to the jury that's been sworn, to have this case hanging over their heads for some indeterminate number of days in June.
> It's unfair to Mr. Wilson to have to wait for this case to begin, not knowing what's going to happen.  And it's unfair to the State.
> ...
> I do find, that in the interest of justice, the most fair decision I can make at this point, is on my own motion to

16

> declare a mistrial pursuant to [Louisiana Code of
> Criminal Procedure] article 775.

And, finally, contrary to the criticisms the Tenth Circuit had in Walck, the trial judge here clearly considered reasonable alternatives to a mistrial, such as recessing the case to the end of the month.[14]  But, given the unusual circumstances, the court carefully determined that discharging the jury was manifestly necessary and in the interest of justice.

The State contends that the facts of this habeas request more closely resemble those confronting the Third Circuit in United States ex rel. Gibson v. Ziegele, 479 F.2d 773 (3d Cir. 1973), cert. denied, 414 U.S. 1008 (1973).  There, a key prosecution witness suffered a sudden "intestinal grippe with acute coronary insufficiency" in the midst of trial, rendering him unavailable to testify for at least one-to-two weeks.  Id. at 775.  Applying standards of manifest necessity and public justice, the Third Circuit affirmed the district court's grant of a mistrial over the defendant's objection, finding that "[the unavailable witness'] testimony was essential and his sudden illness justified the

_____

[14]Indeed, the circumstances presented by this case are distinguishable from United States v. Fisher, 624 F.3d 713 (5th Cir. 2010).  In Fisher, the Fifth Circuit held that scheduling conflicts for two government witnesses did not make a mistrial manifestly necessary where the trial court failed to inquire about the scheduling conflicts of the witnesses, or to explore ways to reconcile those conflicts with the trial schedule, and otherwise failed to carefully consider any reasonable alternative to a mistrial.  Id. at 721-22.

declaration of a mistrial." Id.  The Supreme Court denied the defendant's writ for certiorari. Gibson v. Ziegele, 414 U.S. 1008 (1973).

While the case literature invoked by both sides is instructive, ultimately whether the mistrial declared in this matter was manifestly necessary turns on the unique facts of this case.  Based on the record and the unusual circumstances presented by this case, including that such an essential witness, the victim, suffered an unpredictable medical emergency that threatened her life and prevented her from testifying at trial for an indeterminable amount of time, the Court finds that a mistrial was manifestly necessary.  Cf. Fisher,624 F.3d at 718-19 ("Manifest necessity does not mean absolute necessity that a judge declare a mistrial; we assume that there are degrees of necessity and we require a high degree before concluding that a mistrial is appropriate.").

Wilson makes much of the fact that J.T. was not present in court on June 2, 2011, when the jury was sworn.  This fact is minimized, however, when one considers (1) the trial court's grant of a recess immediately after spending the 7-8 hours selecting the jury; (2) the record establishes that J.T. wanted to and endeavored to attend trial in New Orleans; and (3) the great lengths the State went to in attempting to secure J.T.'s presence.  The Court takes this case as it finds it and, under the circumstances, finds that

the mistrial was due to manifest necessity and retrial is not barred by double jeopardy. "[A] defendant's valued right to have his trial completed by a particular tribunal must in some instances," as here, "be subordinated to the public's interest in fair trials designed to end in just judgments." Wade v. Hunter, 336 U.S. 684 (1949).

Finally, the Court must acknowledge Wilson's recent request that the Court conduct an evidentiary hearing based on what he suggests are misstatements by the State concerning whether the State requested a mistrial and whether the State knew that J.T. was not cooperating. While the request for an evidentiary hearing has been denied, it must be noted that Wilson's characterization of the current record is revisionist at best, and his quest to create a new record (by developing off-the-record discussions among counsel and the trial court) ignores the irrelevance of the facts he seeks to "prove".[15]   Wilson's arguments generate more heat than light.

_____

[15]The Court also notes that the question of whether the State requested a mistrial or a recess is irrelevant to the issue before this Court.  The double jeopardy jurisprudence instead focuses on whether a mistrial is granted over the defendant's objection, which it was.

In replying to Wilson's assertions that the State has misrepresented the record, the State insists that it stands by the record, pointing out that the trial judge said nothing about any representations by counsel for the State that J.T. was hesitant or otherwise unlikely to appear.  It was at that point, says the State, that counsel for defendant had the opportunity to make a record, as lawyers are trained to do, regarding the alleged off-the-record representations made by counsel for the State.

The Court notes that, indeed, Wilson seems to ignore the record regarding J.T.'s cooperation.  Indeed during Wilson's

counsel's cross-examination of Ms. Thornton, one of the District Attorney's investigators, Ms. Thornton testified:

> I told [J.T.'s mother] I was the investigator from Louisiana..., she said, "I know. Jennifer was trying to come." And she was just informing us that she was definitely trying to make it to Louisiana.
> ...
> [Upon meeting J.T.] Well, immediately – again, she knew who we were and what it was in reference to.  And she immediately proceeded to give me a note that she had just been released from the doctors.  And she said, "This is why I couldn't make it." ...
> Q. And did [J.T.] express to you that, at any point, she had not been willing to come to New Orleans?
> A. No, ma'am.  She had given me the notation from the doctors, and advised me that this was why....
> Q.  So did you speak with [J.T.] about the three times that your office tried to secure her presence?
> A.  No, actually, [J.T.] had advised me of similar circumstances of the same thing that the mother had said – about the car trouble and everything....  She was speaking about – that she did try to come....
> ...
> Q.  Did you, at that point, take [J.T.] into custody?
> A.  She was never in custody....
> Q.  At that point she was prepared to go.
> A.  Yes, ma'am.
> Q.   And she agreed that she would? [J.T.] agreed that she would come to New Orleans?
> A.  Yes, ma'am.
> Q.  And she packed, correct?
> A.  Yes, ma'am.

Additionally, the trial court observed during the evidentiary hearing on June 9, with respect to the material witness bond:

> The point of the matter is, they sent two investigators across several states to get there, and they're standing in Clovis, New Mexico, talking to this woman, who willingly

20

Because the mistrial granted by the trial court was on this record manifestly necessary, Wilson's upcoming retrial is not barred by the Double Jeopardy Clause.   Accordingly, Wilson's petition for writ of habeas corpus is DENIED with prejudice.

New Orleans, Louisiana, March 15, 2012

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

gets in the car with them.  And I don't know
what else we need to pursue as far as the
certificate.  They didn't enact the Material
Witness  Bond.   She  voluntarily  went  with
them....  I just don't see where else you're
going with this.  She already said they didn't
enact the Material Witness Bond because the
woman was voluntarily going with them....